## THE BOARD OF SUPERVISORS OF FULTON COUNTY, Appellants, v. THE MISSISSIPPI AND WABASH RAILROAD COMPANY, Appellee.

### APPEAL FROM FULTON.

The answer of a corporation aggregate, should be under seal, but not under oath. If a sworn answer is desired, some managing officer should be made a party, who can answer under oath.

Where a party is directed or asks leave, to file a further answer, or to amend one, the original answer is not to be changed by erasures or interlineations, (except for scandal or impertinence,) but a formal separate answer is to be drawn.

An answer cannot be taken from the files, after exception is taken to it, nor amended, unless in some matter of form or mistake in date.

An answer is irregular, and may be rejected, which is not properly entitled and does not show what bill it purports to answer;—if by a corporation, which is without the seal, and the signature of its chief officer—or if interlined or erased.

If the answer to the charges in the bill is not full, the court should enforce an answer to each specific interrogatory.

Where a party agrees to admit the truth of an affidavit for a continuance, it cannot be contradicted.

Where a company was incorporated to build a railway across the State, as a continuous project under one management, with a common interest, if the charter is afterwards amended so as to divide the project into three parts, to be under separate control, the unity of interest being destroyed, and no proper acceptance of the change of charter has been manifested, subscribers to the stock will be released—the change being so extensive and radical as to work a dissolution of the original contract.

In submitting to the qualified voters, whether the county shall aid in the construction of a railway, it is improper to submit more than one project at a time.

THIS cause was commenced by bill in chancery, filed in the Fulton Circuit Court, October 9, 1857, by the Board of Supervisors of Fulton county, against the Mississippi and Wabash Railroad Company, and John W. Ingersoll, William N. Cline, A. L. Hasleton, Thompson Maple, and John H. Piersol, requiring several and respective answers from them under oath, and praying an injunction, restraining the issuance of $60,000, of the bonds of said county, to the central division of said railroad company, and, also, to enjoin the disposal of $12,000, out of $15,000, of such bonds, then already issued to said central division, and in the hands of some of the defendants, also praying for a perpetual injunction in the premises on the hearing, and a decree for the return of, or compensation for, the $15,000 of bonds so issued, etc., which injunction was issued on the same day, and duly served on the several defendants.

The bill states that the Mississippi and Wabash Railroad Company was chartered by act of the legislature of Illinois, in force 10th February, 1853, to construct a railroad, to commence at Warsaw on the Mississippi river, in the county of Hancock, and running from thence on the most eligible route, eastwardly, by the city of Bloomington, in McLean county, to the east line of the State, with the condition that the work should commence within two years.

The amended and joint and several answer of the railroad company, J. W. Ingersoll, W. N. Cline, A. L. Hasleton, and Thompson Maple, admits the statement.

The bill states that at the solicitation of the railroad company, the complainants, for the purpose of submitting the question to the voters of Fulton county, whether the county should subscribe the sum of $75,000 stock to the company, adopted at their September session, 1853, an order which is made a part of the bill, the first part of which reads as follows:

" Ordered, that the county of Fulton subscribe to the Mississippi and Wabash Railroad Company, and the Petersburg and Springfield Railroad Company, stock to the amount of seventy-five thousand dollars to each of said companies, and that, at the general election, to be held in November next, the question be submitted to the voters of said county, whether said county take stock to the amount of one hundred and fifty thousand dollars, that is to say, seventy-five thousand dollars to each of said companies, according to the provisions of the statute in such case made and provided; that the bonds be issued for said stock to each of said companies, under the provisions of said statute, shall be payable as follows, to wit." Here follows a narration of the terms of the bonds.

" *Provided,* no bonds be issued to either of said companies until the following conditions be complied with, to wit: when it shall be certified to the clerk of this board, by the secretary of the Mississippi and Wabash Railroad Company, that there is seven hundred thousand dollars of the capital stock of said company subscribed, and five per cent. on the same paid into the said road, then the said bonds to issue to said company as the law contemplates." The remainder of the order relates to the Petersburg and Springfield Railroad Company, and the giving of notices for the election.

And the bill continues and states that the election was held in pursuance and on the basis of such order, and the propositions adopted upon the conditions of the same.

The answer admits the statements.

The bill states that the work was not commenced within two years.

The amended answer avers that work was done in the engineering department within the two years, and that, within that time, by an act of the legislature, approved and in force February 9, 1855, the time for the commencement of the work was extended for two years longer, and that the work was commenced by grading, bridging, etc., about the 1st April, 1856, and has been in constant progress ever since.

The bill alleges that since the vote by the people on said proposition, and since the 1st January, 1857, and before the application for the bonds, the charter of the company was materially altered by the legislature, so as materially to change the project, without the assent of the county of Fulton, so as to create three divisions, each under the control of separate boards of directors, and each, in fact, a separate road and enterprise—one division being called the eastern, being all east of the Illinois river, one the central, including all between the Illinois river and the Northern Cross Railroad, and the other the western, embracing all west of the Northern Cross Railroad, and that thereby the terms of the contract between the county and the company have been materially altered.

The amended answer denies that the charter or project has been materially altered, but avers that the legislature, by an act approved in February, 1857, amended the charter, and that it was so amended with the assent of the county, because the county was represented in the legislature by one senator and two representatives who had full knowledge of such amendment, and assented thereto; and that, in the month of March, 1857, the Board of Supervisors of said county assented thereto, and then changed the conditions on which the bonds were to be issued, and ordered the clerk to issue the same when evidence

should be produced that $375,000 had been subscribed to the capital stock within the limits of the central and western divisions, and five per cent. paid thereon.

The bill states that the eastern division has been abandoned.

The amended answer denies the statement, and avers that it is now and always has been the intention of the company to build and construct the entire line as fast as their means would permit, and that the divisions were made for the express purpose of facilitating the prosecution of the enterprise. It avers also that the eastern division was organized under the law of 1857, on the first Wednesday of January, 1858, by the election of commissioners, and that up to the time of organization, such division had been under the management of the company and their agents; that the organization was made in good faith, for the purpose of constructing the eastern division to the state line, and not for the purposes of this suit; that the division was under the charge of James R. Babcock, William S. Mauss and James Harriott, since June 10, 1856, when they were appointed commissioners by the directors of said company; that before the application for bonds, they had purchased of the State the old grade of nine and one half miles east of Pekin.

The amended answer here avers, (but not responsively to any allegation of the bill,) that the complainants, on the 10th September, 1855, passed an order, by which they authorized the clerk to subscribe $75,000 to the stock of the Mississippi and Wabash Railroad Company, in pursuance of the vote and order aforesaid, when it was certified to him by the secretary of the company that $700,000 had been subscribed, and five per cent. paid thereon, as contemplated by the order by which the question was submitted to vote, and that the clerk, in pursuance of said order, did subscribe that sum in July, 1857.

The bill states that the directors had also made material alterations in the plan and design of the road since the taking of the vote of the county.

The amended answer avers that the whole line of the road has been located *via* Bloomington, Pekin, Canton and Carthage, except between Carthage and the west line of Fulton county. That it was the intention of the respondents, and they believe of the directors of the company, to locate and construct the road from Carthage to the west side of Fulton county, so as to connect the entire line of said road, and also to build the road through the entire line, so as to form a continuous line of road as prescribed in their original charter. That said road has not been changed to run by the city of Peoria, nor have any other changes been made so as to change the road to any other route than the one contem-

plated in the original charter. That said road was located as aforesaid, before the application for the bonds.

The bill states, that in the fore part of September, 1857, John M. Ingersoll, president, and one of the commissioners of the central division of the Mississippi and Wabash Railroad Company, and claiming to act as agent of the company, presented to John H. Piersol, clerk of Fulton County Court, three certificates, one of which is a certificate of M. T. Hunt, secretary of the western division, and W. N. Cline, secretary of the central division, that $375,000 had been subscribed to the capital stock of said company, and five per cent. paid thereon, dated July 9, 1857, under the hands of the secretaries, but not sealed.

Another of these certificates is as follows, to wit:

" This may certify that there is seven hundred thousand dollars subscribed to the capital stock of the Mississippi and Wabash Railroad Company, and five per cent. paid thereon.

JOHN GRIDLEY, Secretary,

Mississippi and Wabash Railroad Company.

*Pekin, August* 29*th,* 1857.

The third of these is another and more formal certificate by John Gridley, Secretary Mississippi and Wabash Railroad Company, of the same facts, and is under the private seal of Gridley, there being no corporate seal, as stated in such certificate.

And the bill continuing, states that said Ingersoll, at the time of the presentation of such certificates, demanded bonds of the clerk, of a certain blank form presented at the time for the purpose of being filled up, the obligatory part of which reads as follows, viz.:

" Know all men by these presents, that there is due from the county of Fulton to the central division of the Mississippi and Wabash Railroad Company, or bearer, five hundred dollars, lawful money of the United States, with interest at the rate of seven per cent. per annum, payable annually, on the first day of July in each year, at the treasury of the said county of Fulton, on the presentation and surrender of the annexed coupons. The principal is to be due and payable ten years after the date hereof."

And the bill charges that thereupon the said clerk issued and delivered to said Ingersoll, bonds, as demanded, to the amount of fifteen thousand dollars, of $500 each, and numbered from one to thirty inclusive.

The said answer admits these statements.

The bill states that $700,000 had not been subscribed at the time of the date and presentation of said certificates, and that such amount had not since been subscribed in good faith, and

that five per cent. had not been paid in on such sum, and has not since been paid, but that the certificates were false and fraudulent, and made and procured for the purpose of fraudulently procuring the said bonds of the county, and that by means of such false and fraudulent certificates, such bonds to the amount of $15,000 were obtained.

The amended answer denies that such certificates were false and fraudulent, and avers that there was, at the date of the certificates, subscribed in good faith the sum of $906,050, to the capital stock of said company.

The bill states that a large amount of the subscriptions to the capital stock, and which remain on the books of the company, had, before the application for the bonds, been released and discharged.

The answer denies that any part of the said $906,050 has been released, and avers that James H. Stipp and others, and James Kuykendall, have been released, but that their subscriptions are not estimated in fixing on the amount set forth in the answer, and avers that the whole of the $906,050 remains now on the books of the company in good faith, and not discharged, or any part thereof.

The answer also states that the commissioners of the central division did, at a meeting of their board, appoint John W. Ingersoll to erase the names of such subscribers to the capital stock, as had subscribed to the Jacksonville and Savanna Railroad Company, to an amount equal to the subscription made by them to the stock of the latter company, but that none of such subscriptions have been erased or in any manner released by the said Ingersoll, or any person acting under his authority. That they have been advised by counsel that the action of the commissioners was void, and that the subscriptions are valid. That the amount which was so authorized to be released did not exceed $50,000, including $6,000 subscribed by the Babcocks.

The bill states that a large amount of the stock subscribed is encumbered with conditions, restrictions, manner and time of payment, so as to be unavailable, and cannot and ought not to be taken as a part of a good faith subscription of $700,000 aforesaid.

That a large portion was subject to the express condition that " not more than five per cent. of such subscriptions should be called for until the directors of said Mississippi and Wabash Railroad Company should have reasonable assurance that sufficient funds could be secured to insure the completion of the whole road," and that the subscription books all contained said proviso at the time of the vote by the county. And the bill avers that no such assurance has been had ; and hence such sub-

scriptions are not available within the terms of the order under which the county was authorized to issue bonds.

The said amended answer admits that subscriptions are upon such condition, except as otherwise set forth below, and states that the subscriptions of the city of Keokuk, $150,000; city of Pekin, $100,000; city of Warsaw, $50,000; county of Hancock, $100,000; total, $400,000; are without any condition.

That the subscriptions by the county of Tazewell, $75,000; citizens of Pekin and vicinity, $29,500; total, $104,500; are upon the condition that the road should be located through Pekin, which has been complied with by such location; and that there is no other condition to such subscriptions.

That the subscription by the city of Bloomington, $50,000, is upon the condition that bonds shall not be issued, however, till a sufficient aggregate amount of stock is *bona fide* subscribed, to insure the building and equipment of the entire road.

That the subscriptions by citizens of McLean county, $7,400, are upon the sole condition that they should be expended between Pekin and Bloomington.

That the subscriptions by other citizens of McLean county, $41,200, are upon the condition "that no additional payment over and above the five per cent. now paid, shall be made till a sufficient amount of stock is *bona fide* subscribed to insure, in the opinion of said directors, the building of the road and placing the entire work under contract;" which condition (the answer avers) has been complied with.

That the subscriptions by citizens in vicinity of Tremont, (Tazewell county,) $12,900, are upon the condition that no more than five per cent. shall be called for until the company have reasonable assurance of being able to build and construct said road.

That the subscriptions by citizens of Fulton county, $108,600, are upon the sole conditions "that the road is located through the town corporate of Canton, and a permanent depot be established and maintained therein; and further, that not more than five per cent. shall be called for until the directors shall have reasonable assurance that sufficient funds can be secured to insure the completion of the whole road."

That subscriptions by other citizens of Fulton county, $3,000, are upon the conditions "that a depot be established and kept in Harris township, and that the road shall be contracted from Canton to the Northern Cross Railroad, before any portion of said subscription shall be called for."

That subscriptions by other citizens of Fulton county, $9,100, are upon the conditions "that a warehouse be established, and kept at Cuba, and such other points as public interests may re-

quire, and no portion of subscription to be called for until the road is under contract from Canton westward, and not until after the 1st of January, 1858." And part of these subscriptions are also on other special conditions specified.

That subscriptions by citizens of Hancock, $32,900, are without condition.

That subscriptions by other citizens of Hancock, $6,450, are upon condition that half should be due when the iron laying has been commenced, and balance in three months, with ten per cent. on installments till paid.

That subscriptions by citizens of McDonough county, $100,000, are upon condition that the road shall be located by the way of Fountain Green and Blandinsville to Bushnell.

That the subscriptions of Keokuk and Hamilton Ferry Company and others, $5,000, are without conditions.

The answer avers, that at the date of the certificates, the road was located in and through the towns of Canton and Cuba and the township of Harris, depots established and contracts made with E. P. Buel & Co., for the erection thereof; and that the directors had and still have reasonable assurance that sufficient funds can be secured to insure the completion of the whole road.

That all the subscriptions by corporate bodies were made in pursuance of law, and are valid and binding.

That there may be a small part of the subscriptions that are worthless and unavailing.

That the central and eastern divisions intend and believe they can construct the road from Canton to the east line of the State, in a continuous line, in a reasonable time. That they have available means for that purpose, amounting to one million dollars, which can be increased as soon as the road is under contract.

That on the western division, seventeen miles are ready for the iron, which has been purchased, and the track laying commenced.

That it is the *bona fide* intention of the respondents to construct the road from Canton to the Northern Cross Railroad, by the fall of 1859, to intersect the western division, and that the central division has a contract for putting the same in running order, and twelve miles are graded. That the contractors have made a contract for the iron between Canton and the Northern Cross Railroad, and expect it to be shipped early in the spring, to Liverpool, in Fulton county.

The bill states that John W. Ingersoll, William N. Cline and A. L. Hasleton are commissioners of the central division, and Thompson Maple, treasurer.

346 SPRINGFIELD,

Supervisors of Fulton County *v.* Mississippi and Wabash Railroad Co.

The answer admits the statement.

The bill states that six of the bonds issued by the Fulton county clerk, amounting to $3,000, have been disposed of, and that the balance, $12,000, are in the hands of the commissioners or treasurer of the central division ; and unless restrained, they will dispose of such balance.

The said answer states that $4,500 of the bonds issued have been disposed of, and that the balance ($10,500) of them are in the hands of Thompson Maple, treasurer.

The bill states that said Ingersoll, Cline and Hasleton, claim that they are entitled, on behalf of the central division, to the remaining $60,000, of Fulton county bonds, and have given out that they intend to apply to Piersol, clerk, for the same, at an early day.

To this there is no answer.

The bill requires the defendants to answer pertinent and specific interrogatories propounded—numbered from one to eighteen, inclusive—based upon material allegations and charges in the bill.

To these interrogatories there is no answer except so far as they may be in general terms replied to, in the way of answering the stating part of the bill.

The original answer was the joint answer of the Mississippi and Wabash Railroad Company, John W. Ingersoll, William N. Cline and A. L. Hasleton, and was the same as the amended answer, except that Thompson Maple joined in the amended answer, and except also as appears in the following statement:

The court having sustained certain exceptions to said original answer, and other exceptions to the separate answer of Thompson Maple filed in the cause, the respondents asked and obtained leave to amend their answers, but no manner of making such amendments was suggested by the respondents' solicitors, or granted by the court ; and the solicitors of respondents took from the files the original joint answer aforesaid, and erased parts of the same, made interlineations, and attached parts on separate pieces of paper to be interpolated and read as a part of the answer ; and the original affidavit to the joint answer was interlined and altered, and the jurat erased and a new jurat attached ; and the affidavit as amended was resworn. Such alterations and changes are now a part of the amended and only answer on file, and the interlineations are in brackets in the record, (both in the amended answer and in a bill of exceptions,) and numbered in the margin from one to twenty, inclusive. The said answer being so altered and filed on the 3rd of March, 1858, complainants moved for a rule on respondents' solicitors to strike out the interlineations, interpolations, and to restore

the answer and affidavit to their original condition, which the court overruled, and complainants excepted and now except.

The said amended answer is entitled as follows :

" STATE OF ILLINOIS, FULTON COUNTY, *ss:*

THE BOARD OF SUPERVISORS OF
   FULTON COUNTY,
     *vs.*        *In Circuit Court of Fulton county, Ill.*
THE MISSISSIPPI AND WABASH    *In Chancery. Of February term.*
   RAILROAD Co. and others.

" The joint and several answer of the Mississippi and Wabash Railroad Company, John W. Ingersoll, William N. Cline, A. L. Hasleton and Thompson Maple."

And said answer is signed as follows, no seal for the corporation being attached :

   " The Mississippi and Wabash Railroad Company, John
     W. Ingersoll, William N. Cline, A. L. Hasleton, and
     Thompson Maple."

" G. BARRERE, WALKER & GEE, Solicitors for Defendants."

The complainants then moved the court to strike the amended answer from the files, for the following reasons :

1st. The said paper is not properly entitled for an answer.

2nd. The same does not show to what bill of complaint it is filed for an answer.

3rd. The answer is not signed by said individual defendants in their proper hands respectively.

4th. The said Mississippi and Wabash Railroad Company have not signed the same by its chief officer, nor has the seal of the corporation been affixed.

5th. The original answer has been erased in part, interlineations made therein and other alterations to make an amended answer, without the consent of the court.

6th. The same is otherwise informal.

Which motion the court overruled, and complainants excepted.

The complainants filed thirty-seven exceptions to the original joint answer, and the court overruled those numbered 1, 2, 3, 4, 5, 7, 9, 10, 11, 12, 13, 17, 18, 19, 21, 22, 23, 24, 26, 27, 28, 29, 30, 31, 33, 35, and 37, and the complainants excepted.

The whole thirty-seven exceptions to the original joint answer stood as to the amended one, and a portion of which are substantially as follows:

3rd. Defendants have not, etc., answered whether, since the Fulton county vote, the charter of the Mississippi and Wabash Railroad Company has been materially changed, so as to alter the contract with the county, *without the assent of the county.*

4th. Defendants are impertinent, evasive, frivolous, etc., in charging assent of the county by reason of representation in

.the legislature; also, in charging assent through. subsequent action of the supervisors.

9th. No answer as to whether or not Ingersoll was agent for the Mississippi and Wabash Railroad Company when he applied for the bonds, etc.

The answer admits that Ingersoll applied for the bonds, etc., " claiming to act as agent for the company," but fails to answer .whether or not he was in fact such agent.

14th. No sufficient answer as to whether the conditions of subscriptions have or had been complied with, so as to render· them available.

No answer as to compliance with condition of seventy-four shares. As to $120,000, subscription of Fulton county citizens, no compliance set out. Not is any compliance set out as to the $100,000, subscription by citizens of McDonough county.

16th. No sufficient answer as to whose and what amount of subscriptions had been released and discharged at the date and producing to the clerk of said certificates; nor as to what has been done by the company, or the directors or commissioners thereof, in respect to such releases and discharges; nor whether any subscriptions had been receipted for, without payment in full.

17th. No sufficient answer as what amount of subscriptions were and are available.

No answer as to whether or not the proviso or condition, that " not more than five per cent. of such subscriptions shall be called for until the directors of the Mississippi and Wabash Railroad Company shall have reasonable assurance that sufficient funds can be secured to insure the completion of the whole road," was contained on all the subscription books of the company, at the time of the order and vote in reference to the Fulton county subscription, as charged in the bill.

19th. No sufficient answer as to whether or not the directors of said company, at the time of such certificates and the issue of bonds, had reasonable assurance that sufficient funds could be secured to insure the completion of the whole road.

23rd. No answer as to when the corporation bonds, paid or to be paid on subscriptions, are or are not to be payable, nor as to the market value of such bonds.

26th. No answer as to what subscribers' names and what amount of subscriptions have been erased from the stock books, and under what authority.

27th. No answer as to what the construction of said road would cost, nor as to how much of the amount the company have " reasonable assurance " can be secured, nor as to in what the reasonable assurance consists.

30th.    No answer as to whether Ingersoll, Cline and Hasleton, have given out that they are, on behalf of the central division of said company, entitled to the bonds of Fulton county, to the further amount of $60,000, and that they intend to apply for the same at an early day.

33rd.    That defendants have not, etc., answered the specific interrogatories (numbered from 1 to 18, inclusive) in the complainants' bill, nor any or either of them.

35th.    The answer is not properly signed; the railroad company not having signed by any authorized officer or agent, nor used its corporate seal, and all the other parties having only signed by solicitors.

And the court overruled each and every of the said exceptions, and held the answer to be sufficient, to which the complainants excepted.

Afterwards, and on the 5th of March, 1858, the complainants filed a general replication to the amended answer; and on the same day a decree was rendered by the court, by agreement of parties, that the cause be heard and determined by the court, in vacation of McDonough April term, as of the then Fulton term, reserving the right to either party, however, to take further evidence to 10th April, 1858, to have a further continuance, upon sufficient cause shown, and fixing terms of appeal, etc.

At the McDonough April term, 1858, the parties appeared before WALKER, Judge, and the complainants moved for a continuance, predicating their motion upon the affidavit of Asoph Perry, one of the agents of complainants. After the formal parts, the affidavit proceeds in substance, as follows:

" That the complainants expect to, and this deponent believes they can, prove by Henry Farnam, William McAlpine and Norman B. Judd, that the two first are civil engineers, of long and large experience in building railroads, in different parts of the United States, including this State; that said Farnam has also been an extensive contractor and builder of railroads in this country, and that he has bought and sold, and negotiated large sums of county and city bonds, and other railroad securities, within the last several years, and has been and is now well acquainted with the value of such bonds and securities, and the amount that can be realized therefrom, and the cost of constructing railroads; by the said McAlpine, that he was for some time chief engineer of the State of New York, and is well acquainted with the cost, value, uses, and manner of constructing railroads, in this State; and by said Judd, that he has for the last eight or ten years been largely interested in, and engaged in, the construction and management of railroads in this State, and that he is well acquainted, from the practical experience, with what it

costs to construct and equip railroads in this State; and by the said Farnam and Judd, that they are acquainted with the country, and the resources for the support of a railroad, along the line of the contemplated Mississippi and Wabash Railroad; and by the said Farnam, McAlpine and Judd, that a reasonable price at which western city and county bonds to railroad companies, could be used in the construction of railroads, at and during last fall, would not exceed fifty per cent., and that for two or three years before that time, they could not be used for more than seventy-five per cent.; and that the average cost of equipping the Mississippi and Wabash Railroad, will average $25,000 per mile, from Warsaw, Illinois, to the east line of the State, in cash funds, or an equivalent thereto; that a reasonable cash basis to insure the construction of the whole line of said railroad, will not be less than $10,000 per mile for the whole distance; and a reasonable cash basis for the central division, in case the eastern division is not completed, and the western division is not built, to meet the central division at the Northern Cross Railroad, and in order to insure the completion of the same, will not be less than $12,000 to $15,000 per mile, and for a less portion thereof, not completed to the Illinois river, it would require at least $15,000 per mile; and that the value of stock in the whole road completed, from Warsaw to the east line of the State, would be equal to a fair average value of the best roads in the State; and that the dividends on such a road would be as much as on the best lines in the State; and that the stock and dividends in a road from the Northern Cross Railroad to Canton, would be nothing and entirely worthless; and that the stock and dividends in the central division, if completed, and not connecting with the eastern and western divisions, would probably be worthless, and at most of very little value; that the stock of the best roads in the State, until within a year past, was worth from 80 cents to $1.20, and since from 50 to 80 cents; and that the amounts of stock set forth as subscribed in the answer, would not, at any time since the charter of the company, furnish any reasonable ground to expect that the entire line, or the central division, could be completed." * * *

"That complainants expect to prove, and deponent believes, they can prove, by Charles K. Hume, that he procured some $50,000 to $60,000 of subscriptions to the stock of the Mississippi and Wabash Railroad Company; and by Hiram Markham, that he obtained some $30,000 of subscriptions to the capital stock of said company; and by both of said witnesses, that such subscriptions were procured by them, not as agents of the company, but in behalf of the citizens of McDonough county, for the purpose of proposing the same to the western division

of said company ; that the said subscriptions were all conditioned to be paid only in case the said railroad should be located by the way of Blandinsville and Bushnell, there to meet the central division of said road ; that the said books and subscriptions still remain in the hands of the said Hume, Markham, and one Dan Markham, and have never been delivered to said company, or the western division thereof, or any of the officers of either, and have never been offered to them ; and that the said subscriptions have never belonged to or been under the control of said company ; and further, to prove by the said Markham, that certain obligations, executed by responsible persons, to grade and tie the road through McDonough county, east to Bushnell, in case the said road was to be located to Bushnell by way of Blandinsville, are still in the possession of the said Markham, and have never been delivered or offered to the company, or any division or officer thereof, and that the same are not obligatory or binding on the persons signing the same ; and that the said subscriptions, so procured by said Hume and Markham, are the same that are claimed as the $100,000 subscription to the capital stock of said company, in McDonough county, in the answer of respondents, and in the affidavit of M. T. Hunt, thereto attached."

The remaining portions of the affidavit relate to the diligence exercised by the complainants, in order to procure such testimony, etc., as the foundation for a continuance.

The affidavit being read to the court, in support of the motion, objection was made to the allowance of the motion, by respondents, but the court overruled the objection, and decided that the cause should be continued, unless the respondents admitted the truth of the facts set forth in the affidavit; which they agreed to do, and the court thereupon refused to continue the cause, and the parties proceeded to trial.

The complainants introduced, and read in evidence, without objection, the deposition of *John W. Ingersoll,* in which he testified substantially as follows : That he resides in Canton, and is president of the board of commissioners of the central division of the Mississippi and Wabash Railroad ; that he was elected one of the directors and vice-president of the company, in June or July, 1853, and has continued to hold such offices to the then present time ; and in June, 1856, he was appointed a commissioner of the western division ; has not been suspended in these offices.

That the Mississippi and Wabash Railroad line was surveyed in the summer of 1853, from La Fayette, Indiana, to Canton, Illinois ; the old survey of the Peoria and Warsaw Railroad was adopted from Canton to Warsaw, and since then, various

surveys and locations have been made in different, parts of the line of the road. From witness's knowledge, no survey, except as above stated, from the east line of the State to Bloomington. From Bloomington to Warsaw, the road has been surveyed and located, with the exception of the location between the Northern Cross Railroad and Carthage. Such location runs through the towns of Tremont, Pekin, Kingston, Canton, Cuba, Marietta, Carthage, Hamilton and Warsaw. The location from Bloomington, westward, runs to a point five miles east of Bardolph, on the Northern Cross Railroad. There is no definite location of the road from this point, five miles east of Bardolph, westward to Carthage. There are two surveys; can't state which the company will adopt. If the northern one is adopted, the road will run through Bushnell and Blandinsville, to Carthage; if the southern one, it will run through Bardolph, Macombe, and to Carthage. Bardolph is about six miles south-west of Bushnell.

That the length of the Mississippi and Wabash Railroad, is about two hundred and twenty or two hundred and thirty miles.

Witness knows of no local basis for building the road from Bloomington, east to La Fayette. The company have expended none of their means, in erecting a bridge across the Illinois river, at Pekin; witness knows of a bridge being built by the Illinois River Railroad Company, and witness has understood that by some arrangement, (don't know what) the Mississippi and Wabash Company can cross said bridge.

No depots or station-houses have been built along the line of said Mississippi and Wabash Railroad, but they have been established and contracted for, to be built at such points in Canton, Cuba, and in Harris township, as the directors shall determine upon and direct. The particular points in such places are not yet decided upon by the directors of the company, for the establishment of such depots and station-houses.

Kellogg and Kenyon's subscriptions of $100,000, made at the organization of the company, were released, and the subscription of the city of Pekin, of $100,000, substituted in lieu.

A majority of the subscribers to the Mississippi and Wabash Railroad stock, named in interrogatory 27th, of respondents' answer, are subscribers to the Jacksonville and Savanna Railroad stock, and by the resolution of the board of commissioners of the central division of the Mississippi and Wabash Railroad Company, they might be released to the amount of their subscriptions to the Jacksonville and Savanna Railroad Company, (amounting to about $50,000,) by forfeiting all payments heretofore made by them, (being generally five per cent.,) and applying to me (as the authorized agent) to erase their names

from the subscription books of the Mississippi and Wabash Railroad Company. Witness has not erased any names.

There was action by the board of directors of the Mississippi and Wabash Railroad Company, in June, 1856, at Peoria, in relation to releasing such subscribers. Witness's impression is that the action of said board, at that time was, that subscribers to the Mississippi and Wabash Railroad residing in Fulton county, were not to pay their subscriptions to said Mississippi and Wabash Railroad, until the two local directors of said road, residing at Canton, Fulton county, should call on them.

There is a general understanding in the community, based upon the action of the aforesaid boards of directors and commissioners, that the subscribers to the Mississippi and Wabash Railroad, who have subscribed to the Jacksonville and Savanna Railroad, were released from their subscriptions to said Mississippi and Wabash Railroad, to the amounts subscribed to the Jacksonville and Savanna Railroad.

The $50,000 subscriptions spoken of are not considered available means to the road, and it is not the intention of the officers of said company to collect the same.

About thirty miles of the central division (from Canton to the Northern Cross Railroad) are under contract. The entire length of that division is about fifty miles, and that portion between Canton and Pekin, (about twenty-two miles,) is not under contract.

It is the intention of the officers of the central division, either as an independent line, or in conjunction with the Peoria and Hannibal Railroad, to construct the said railroad between Canton and Pekin; and witness thinks we (officers of the central division) have reasonable assurance that the company will build the same. These assurances are, that thirty miles of railroad now under contract for completion and equipment, will form a good basis for expenditures for further continuances of the work. $50,000, subscription to the stock of the road, promised by the Kingston Coal Mining Company, to be subscribed. $175,000, subscribed by Peoria and Fulton counties, to the Peoria and Hannibal Railroad Company. The line of both said roads covers the same ground from Canton to a point opposite Pekin, which roads may be consolidated, or jointly use the same track. Said joint occupancy or consolidation has been a matter of conference between the directors of the two companies. The progress and completion of portions of the work on other divisions is a further assurance, and the increased private subscriptions that may be obtained when the work is about to be commenced. These are all the assurances I know of, that the company have of constructing the road from Canton to Pekin.

23

This part of the road has not been put under contract by the Mississippi and Wabash Railroad Company, nor by the central division thereof. No contract has been made between the Mississippi and Wabash Railroad Company, and the Peoria and Hannibal Railroad Company, to run on the same track.

Under our contract, the cost per mile to construct and equip the road between Canton and the Northern Cross Railroad, including rolling stock, depot, water-tanks, fencing and turn-tables, etc., is to be $19,000.

The available means belonging to the central division, 9th October, 1857, was about $75,000 of private subscription, and further pledges of private subscription dependent upon the point of intersecting the Northern Cross Railroad, and the further sum of $75,000, subscribed by Fulton county, (the subject matter of this suit;) and the further sum of $350,000 to $400,000, of the bonds of the central division of said company, agreed to be paid by the central division, and agreed to be received by the contractors in payment for their work. The contingent subscription referred to, is $15,000 to $20,000, subscribed in the vicinity of Bardolph, conditioned upon the road crossing the Northern Cross Railroad at that point, and a pledge of a portion of the town site, the value of which is unknown to the witness. The amount of subscription in vicinity of Bushnell is unknown to witness. The whole amount of private subscriptions belonging to the central division is about $135,000, including the conditional subscription at Bardolph. Would say that $10,000 of this is most available, over and above the $50,000 spoken of before. This statement of the available means of the central division includes the expenditures already made on that division.

On the 9th of October last, there was no contract between the central and eastern, and western divisions as to making connections, but conferences had been held in the matter.

The commissioners of the central division organized on or about the 6th of April, 1857, under the law dividing the road into divisions.

Witness was somewhat acquainted with the cash value of county and city corporate subscriptions to railroads, about 9th of October, 1857. At that time the market value was very much depressed. A short time before, they would command from 75 to 90 cents on the dollar; since then, up to the time of testimony, (March, 1858,) they have ranged from 40 to 60 cents on the dollar.

The board of directors of the Mississippi and Wabash Railroad Company, in June, 1853, cancelled and set aside the

subscriptions, made at the organization of the company, of the following persons and amounts :

John W. Ingersoll, $20,000; James H. Stipp, $20,000; Amos C. Babcock, $5,000; William Babcock, $20,000; A. L. Hasleton, $5,000; Thompson Maple, $20,000; William H. Rosevelt, $9,000,—they having been supplied by sundry persons in Fulton county, as per Exbibit F. of the answer of respondents. This was besides the release and discharge of Kellogg and Kenyon's $100,000 subscription.

The subscriptions to the Mississippi and Wabash Railroad Company, to the amount of about $100,000, in the vicinity of Fountain Green, Blandinsville and Bushnell, are upon the condition that the northern route, heretofore spoken of, shall be adopted; and the probabilites are that such route will be adopted.

On cross-examination by counsel for the respondents, the witness testified substantially as follows :

None of the subscriptions of Ingersoll and others, spoken of above as having been cancelled and discharged by the company in June, 1853, were mentioned in the answer of respondents as good and valid subscriptions, except the subscription of $9,000 by William H. Rosevelt, the release of which is not acknowledged by the commissioners of the western division to be good.

The deposition of *Edgar P. Buell*, taken at the same time, was then read in evidence, without objection, in which he testified substantially as follows :

Am a railroad contractor—reside in Canton. I have a contract in writing to build a railroad, now produced and attached to the depositions.

This contract is dated 8th July, 1857, and purports to be between the commissioners of the central division of the Mississippi and Wabash Railroad Company, and Edgar P. Buell and George Higby, under the name of E. P. Buell and company, and by which said Buell and company agree to build, construct and equip a railroad, equal in kind and work, etc., to the Illinois Central, from Canton, Fulton county, to the Northern Cross Railroad, in McDonough county, Illinois, etc., etc., and deliver the same by the 1st July, 1859, for $19,000 per mile of main track, and $8,000 per mile of side track—the payments to be made as follows :

Fulton county bonds, $75,000; cash, $150,000; balance in first mortgage bonds.

It is understood that the amount specified for cash payment is more than the cash subscription to the road, and if the commissioners of the central division are unable to raise the $150,000 cash, then they may substitute any amount not exceeding

$75,000, an equal amount of stock in said road, on first mortgage bonds, (as elected by Buell and company,) in lieu of cash, at the value of 75 per cent. on the dollar. The payments are to be made as the work progresses in cash, county bonds and stock in proper proportions. First mortgage bonds sufficient to cover the iron, rolling stock, and transportation, are to be furnished Buell and company, when procured and delivered by Buell and company.

The commissioners are to furnish the right of way.

*Arthur Bell* testifies in substance as follows:

Resides in Canton. Witness subscribed to the amount of $1,000 to the Mississippi and Wabash Railroad stock. In September or October, 1856, I made an arrangement with William Babcock, that if I would take $500 stock in the Jacksonville and Savanna Railroad Company, that I should be released from the $1,000 subscribed to the Mississippi and Wabash Railroad Company, by loaning the five per cent. I had paid in. I subscribed and paid the $500 to the Jacksonville and Savanna Railroad Company.

I got a letter from Dr. William N. Cline, in May or June, 1857, in which he stated that $500 of my subscription to the Mississippi and Wabash Railroad Company had been transferred to the Jacksonville and Savanna Railroad Company, leaving me owing $500 to the former company. I afterwards called on J. W. Ingersoll, who told me there was an official recognition by the board, of the acts of the agents making the transfers, and that I was released to the extent that said Babcock had represented to the officers of the Mississippi and Wabash Railroad Company. Dr. Cline's letter I think was signed as secretary of the company.

At the time of the agreement to release or transfer my subscription, I asked Babcock if he had any authority to act, and he said he had, and that the whole thing was dead, and I should never be called upon for the money. John W. Ingersoll recognized Babcock's acts.

On cross-examination, the witness stated: I was informed by Dr. Wm. N. Cline, that I was released from half of my subscription to the Mississippi and Wabash Railroad Company. Don't know whether it is in writing or not. John W. Ingersoll informed me also that I was released, but he didn't say for how much. Don't know whether or not my subscription has been erased from the books of the Mississippi and Wabash Railroad Company.

*John Shinn* testified in substance as follows:

Was present at a railroad meeting in Canton, when the Jacksonville and Savanna Railroad books were opened. I sub-

Supervisors of Fulton County *v*. Mississippi and Wabash Railroad Co.

scribed $500 to the Jacksonville and Savanna Railroad on William Babcock's book, and he told me I was released from my Mississippi and Wabash Railroad subscription.

I have paid my Jacksonville and Savanna Railroad subscription, and have not been called on for my Mississippi and Wabash Railroad subscription, except the $25 paid at first.    I paid part of my Jacksonville and Savanna Railroad subscription to David J. Waggoner, who told me he was authorized to release me from the Mississippi and Wabash Railroad subscription, and he went to Maple's book and came back and told me that my subscription was crossed off.    Thompson Maple also told me I was released from my subscription to the Mississippi and Wabash Railroad Company.

Several others testified to similar facts.

*James H. Stipp* testified substantially as follows:

I was a director of the Mississippi and Wabash Railroad Company, released, I believe, in June, 1853, and have continued such director ever since, unless the act of the legislature, dividing the road into three divisions, repealed me out of office. I did have a hope of said road being built up to the 10th July, 1856.    After that time, as a member of said board , as far as Canton was interested, I considered said road dead.    At the same time it was the intention of the board to keep up the organization.    If the act of the legislature, in January or February, 1857, dividing said road into three divisions, can be considered as resuscitating said road, it was then done, that being the first thing towards resuscitating it to my knowledge, after 10th July, 1856.

There was a meeting of the board of directors of said road, held at Peoria, I believe, on the 10th June, 1856.    At that meeting a resolution was adopted, of which, I believe the following is a substantial copy:

" *Resolved*, That the stock subscribed in Fulton county, or by persons residing in Fulton county, shall not in any event be required to be paid in by them, or any part thereof, unless the director or directors residing in said county shall desire the collection thereof, nor until that portion of said road lying in said county shall be contracted for construction and completion ; and that not until the happening of both of said events, shall said stock be deemed payable to said railroad company.

" *Provided*, That within thirty days from the date hereof; offers acceptable to the vice-president, and afterwards confirmed by the board in substance, shall be made for the construction of the road between Canton and the Illinois river, or Canton and Peoria, that then and in such case, the above resolution shall have no force."

That was the only thing done by the board toward changing stock from the Mississippi and Wabash road to the Jacksonville and Savanna road. The object of the resolution was, if there was not something done within thirty days, it was our intention at Canton to abandon the project of the Mississippi and Wabash Railroad, and go on to the Jacksonville and Savanna Railroad; and it was our intention not to call on the subscribers to the Mississippi and Wabash Railroad for their subscriptions who should subscribe a like amount to the Jacksonville and Savanna Railroad. I did give such subscribers assurance that their subscriptions to the Mississippi and Wabash Railroad would not be called for, if they subscribed to the Jacksonville and Savanna Railroad.

Said Mississippi and Wabash Railroad was abandoned by us at Canton, and the Jacksonville and Savanna taken up, for the reason that we could not raise the means for making a connection with Peoria, and we wanted to make a connection by railroad to some point, and believed we could make one with the Peoria and Oquawka Railroad. I think that under this arrangement something like $50,000 was subscribed to the Jacksonville and Savanna Railroad by those who had subscribed to the Mississippi and Wabash Railroad.

John W. Ingersoll and myself were the local directors in Fulton county, of the Mississippi and Wabash Railroad, in June and July, 1856, and there has been no change up to this time in the original board for said county.

I have never requested, expected, or desired the subscribers to the Mississippi and Wabash Railroad Company who have subscribed to the Jacksonville and Savanna Railroad, to pay the subscriptions to the former company, and I have never heard that Mr. Ingersoll had. Since the 10th July, 1856, I have not, in my capacity as one of the local directors of the Mississippi and Wabash road required or attempted to make any collection of subscriptions to the Mississippi and Wabash Railroad, and I have no knowledge of John W. Ingersoll having done so.

No portion of the Mississippi and Wabash Railroad lying in the county of Fulton, has been put under contract by the directors. Have been told by the commissioners of the central division, that that part of said road between Canton and the Northern Cross Railroad, has been put under contract.

Since the 10th June, 1856, there has not, to my knowledge, been any offers or propositions to said Mississippi and Wabash Railroad Company, to build said road between Canton and the Illinois river, or between Canton and Peoria, which were accepted by the vice-president and confirmed by the directors.

On the 9th of October, 1857, and at the present time, I should

think it would take $2,000,000 to give reasonable assurance to the directors to insure the completion of said Mississippi and Wabash Railroad. The company have not at any time, I think, since July, 1856, had reasonable assurance that sufficient funds could be raised to secure the completion of the whole road.

The complainants then read in evidence a stipulation by the parties, agreeing to the following facts:

That James Haines, the treasurer of said railroad company, (Mississippi and Wabash,) has no money belonging to said company in his hands.

That the commissioners of the eastern division of said road, have no funds in their hands belonging to said division.

That there has been no regular meeting of either the old or new board of commissioners of said division; that they have not elected any president, treasurer or secretary of the board, and that there has been no record left of any meeting, or of the proceedings of either of said boards.

That on the subscriptions, purporting to have been made by the county of Tazewell, no five per cent. or any other amount has been paid in to the company by said county, but that a mandamus is now pending to compel the said county to issue bonds to said company.

That at the same time that a vote was taken by said county, to subscribe said stock, the said county also voted for and against subscribing $25,000 to the eastern extension of the road crossing at Peoria, called the eastern extension of the Peoria and Oquawka Railroad.

That the city of Pekin has taken stock in the Illinois River Railroad to the amount of $100,000, and $30,000 in the erection of a bridge across the Illinois bottom, and issued her bonds for the same.

That the county of Tazewell has voted $100,000 to the capital stock of the Petersburg and Tonica Railroad Company, which vote was taken in the year 1857.

That the Mississippi and Wabash Railroad Company have not paid anything on the building of the railroad bridge across the Illinois river, at Pekin, but that the work done on the same, was done by the Illinois River Railroad, and that the said Mississippi and Wabash Railroad have no contract or agreement for the use of the same.

That William B. Parker, as clerk of the city of Pekin, has access to all the records of the city, and that we will make no objection to the form or substance of the certificate thereto attached.

That the board of commissioners appointed by the board of directors of the Mississippi and Wabash Railroad Company,

have purchased the grade of the Bloomington and Pekin Railroad Company, and paid five or six hundred dollars. That they have also caused the line of said Mississippi and Wabash Railroad from Pekin, to the east line of Tazewell county, to be surveyed ; and also caused an estimate of the cost of construction of the same to be made ; and also advertised for the letting of the same. That the only record or minute of the same, is the minutes or memorandum of W. S. Mauss, one of said commissioners, for the purpose of reporting the same to the board of directors, or to the board of commissioners of the eastern division.

And the complainants then read in evidence, without objection, the following copy from the records of the Mississippi and Wabash Railroad Company :

" *Resolved,* That should this road, or our successors, not permanently locate said road through the city of Pekin and Canton, the subscriptions made by the citizens of Tazewell and Fulton counties aforesaid to the stock of this road, shall, at the option of said subscribers, be declared null and void, and the five per cent. installment paid thereon be refunded to said subscribers, with ten per cent. interest."

" *Resolved,* That the subscription made by Benjamin Kellogg, Jr., and D. P. Kenyon, for one hundred thousand dollars to the capital stock of said company, may be cancelled, and the corporate subscription of Pekin substituted therefor."

" *Resolved,* That the subscriptions of John W. Ingersoll, James H. Stipp, Amos C. and Wm. Babcock, A. L. Hasleton, and Thompson Maple may be cancelled whenever the pledged subscriptions of sundry citizens of Fulton county shall be regularly made upon the books of the company."

" *Resolved,* That the route of Pekin and Canton be adopted, if a right of way can be reasonably obtained, and a favorable line is indicated by the surveys."

" The president and vice-president now report that it appears that private subscriptions to the stock in Fulton county, to an amount exceeding the subscription of John W. Ingersoll, for $20,000, James H. Stipp, for $20,000, Amos C. Babcock, for $5,000, W. Babcock, for $20,000, A. L. Hasleton, for $5,000, Thompson Maple, for $20,000, and William H. Rosevelt, for $10,000, amounting in all to $100,000. It is therefore ordered by the road, with the assent of the said John W. Ingersoll, James H. Stipp, Amos C. and Wm. Babcock, A. L. Hasleton, Thompson Maple, and Wm. H. Rosleton, that the above named subscriptions be, and the same are hereby cancelled and set aside, except $1,000 of the subscription made by Wm. H. Rosevelt."

" *Resolved*, That James Kuykendall of Fulton county be and is hereby released from any liability on his subscription to the stock of the Mississippi and Wabash Railroad Company, he forfeiting his five per cent. already paid us."

The following meeting was held at Peoria, the 10th of June, 1856, and was the last meeting held by the board.

" Board met pursuant to adjournment.

" *Resolved*, That the stock subscribed to the Mississippi and Wabash Railroad Company by persons residing in the county of Fulton, shall not in any event be required to be paid by them, or any part thereof, unless the director or directors residing in said county, shall desire the collection thereof, nor until that portion of said road lying in said county, shall be contracted for construction, and that not until the happening of both of said events, shall said stock be deemed payable to said railroad company. Provided, that within thirty days from date hereof, offers acceptable to the said vice-president, and afterwards confirmed in substance by the board, shall be made for the construction of the road between Canton and the river, or Canton and Peoria, that then and in such case, the above resolution shall be of no force."

The parties agreed that the last meeting held by the directors of the Mississippi and Wabash Railroad Company, was on the 10th June, 1856, at Peoria, and that the last above order is the last entry appearing on the records of the proceedings of the company, which was of that date.

The complainants then called upon respondents in open court, to produce all the books of subscription to the capital stock of said company, in their possession or control, and they having produced certain books, their contents were read in evidence by the complainants:

On Book No. 1, opened at Pekin, July, 1853, $2,100, are subscribed, conditioned that the road is located through the city of Pekin.

Also, on the same book, subscriptions are made to the amount of $76,000, without condition, including a subscription of $75,000, in the name of Tazewell county, by the county clerk.

A copy of the above subscription book was read in evidence, by agreement of parties.

On Book No. 2, opened June, 1853, there appears to be subscribed, without condition, and chiefly by attorney, $276,300, including the following: A. C. Babcock, $5,000, Thompson Maple, $20,000, Benj. Kellogg, Jr., $75,000, James H. Stipp, $20,000, Wm. Babcock, $20,000, D. P. Kenyon, $25,000, John W. Ingersoll, $20,000, A. L. Hasleton, $5,000, W. H. Rosevelt, $10,000, city of Warsaw, $25,000; also including $7,500, the

names of the parties subscribing which, are cut out of the book; also $2,000, the name of the person subscribing which, is scratched off the book.

The same book also contains further subscriptions to the amount of $2,800, without condition.

Book No. 3, contains an agreement to subscribe $5,000, without condition.

Book No. 4, (Bloomington) contains subscriptions to the amount of $48,600, conditioned " that no additional payment over and above the five per cent. now paid, shall be made till a sufficient amount of stock is subscribed *bona fide* to insure, in the opinion of said directors (of the Mississippi and Wabash Railroad Company), the building of the road, and the placing of the entire work under contract."

This book also contains the subscription of $50,000, by the city of Bloomington, through the mayor, payable in seven per cent. city bonds, at twenty years from their date, conditioned that said bonds shall not be issued, however, till a sufficient aggregate amount of stock is *bona fide* subscribed to insure the building and equipment of the entire road.

Subjoined to the foregoing subscription list, is an agreement that they will pay, of the above subscriptions, $7,400, without any conditions or restrictions, except that the money shall be called for only as other subscribers are required to pay, and shall be expended on the line between Pekin and Bloomington.

One of the books opened at Canton, July 1st, 1853, contains subscriptions to the amount of $41,850, upon the proviso that " said railroad is located through the town corporate of Canton, and a permanent depot is established and maintained by said company therein, and further provided, that not more than five per cent. of our subscriptions shall be called for until the directors of said company shall have reasonable assurance that sufficient funds can be secured to insure the completion of the whole road."    $6,000 of the above subscription (by the Babcocks) is also subject to the condition that " the road is located through Utica, and a side track and depot is built at or near Utica, at the most convenient point for the Copperas Creek business."

Another book opened at Canton, 1853, dated 1st July, 1853, contains subscriptions to the amount of $21,900, subject to the same provisos as those last above quoted; $100 of the above is payable on the completion of the road.

On each of the above mentioned Canton books, there are several subscriptions, in addition to those included in the above amounts, but which appear to be erased from the books, by ink lines drawn through them, etc.

The complainants then called on the respondents to produce a record of the proceedings of the commissioners of the central division, since their organization, which they did, and the complainants offered and read in evidence, without objection, the following order:

" At the first meeting of the commissioners of the central division of the Mississippi and Wabash Railroad Company, held in the city of Canton, on Thursday, the 7th day of May, 1857,

" On motion, John W. Ingersoll was elected president, and W. N. Cline, secretary of said Board.

" On motion, the following preamble and order were adopted:

" Whereas, during the temporary partial suspension of the Mississippi and Wabash Railroad Company the last eighteen months, certain subscribers to the stock of said road in the city of Canton and vicinity, subscribed to the stock of the Jacksonville and Savanna Railroad, with the understanding implied, that they would be released from their subscriptions to like amount in the Mississippi and Wabash Railroad ;

" It is therefore ordered, that subscribers to the stock (in Canton and vicinity) of the Mississippi and Wabash Railroad, who have heretofore subscribed to the stock of the Jacksonville and Savanna Railroad, are hereby released (if they so desire) from the subscription heretofore made to the stock of the Mississippi and Wabash Railroad, to the same amount they have subscribed to the said Jacksonville and Savanna Railroad.

" Provided, persons so released forfeit all payments heretofore made to the stock of the Mississippi and Wabash Railroad ; and John W. Ingersoll is hereby authorized to erase the names of such subscribers from the books of said Mississippi and Wabash Railroad Company, in accordance with the provisions of the foregoing order."

And in the consideration of the evidence the court decided that the statements in the affidavit of Asoph Perry for a continuance, and admitted by the respondents, were not to be taken as absolutely true, but were to have the same weight as if such facts had been sworn to by the witnesses named therein, and were liable to be contradicted or qualified by other evidence ; to which decision the complainants then and there excepted:

And the court then dissolved the injunction, and dismissed the bill, and rendered a decree to that effect as of the February term, 1858, of the Fulton Circuit Court, in pursuance of the decree then entered ; to which the complainants excepted.

The complainants below now assign the following errors in this court:

1st.　The Circuit Court erred in overruling complainants' exceptions filed to the original joint answer of the Mississippi and Wabash Railroad Company, John W. Ingersoll, William N. Cline and A. L. Hasleton.

2nd.　The Circuit Court erred in overruling complainants' motion for a rule on respondents' solicitors to strike out the interlineations, interpolations, amendments and alterations made in the original answer aforesaid, and the affidavit subjoined by way of making an amended answer for the parties named in the first assignment of errors joined by Thompson Maple, and to restore the answer and affidavit to their original condition.

3rd.　The Circuit Court erred in overruling complainants' motion to strike from the files the paper purporting to be the amended answer of the Mississippi and Wabash Railroad Company, John W. Ingersoll, William N. Cline, A. L. Hasleton and Thompson Maple.

4th.　The Circuit Court erred in overruling complainants' exceptions to said amended answer.

5th.　The Circuit Court erred in admitting and considering improper evidence.

6th.　The Circuit Court erred in its decision as to the statements in the affidavit of Asoph Perry for a continuance.

7th.　The Circuit Court erred in dissolving the injunction and dismissing the bill, and rendering the decree therefor.

8th.　The proceedings below were otherwise irregular, informal, and insufficient.

GOUDY & JUDD, for Appellants.

WILLIAMS, GRIMSHAW & WILLIAMS, and C. L. HIGBEE, for Appellee.

BREESE, J.　Very many important questions are presented by this record, and ably argued by counsel; but we do not deem it necessary to notice all of them, inasmuch as we are satisfied one of them alone is quite sufficient to determine the case in favor of the appellants.　There are, however, some questions of practice determined against the appellants, which ought to be noticed for the government of future cases in chancery, and which, we think, were erroneously determined, and might, of themselves, be sufficient to reverse the decree.

It appears, by the record, that the answer of the individual defendants was sworn to.　The answer of the corporation was not in the mode required by law in such cases.　Formerly, it was uncertain whether defendants, as a body politic and cor-

porate, were to answer in a suit against them in equity, under an oath; but now, it is well settled, that a corporation aggregate must make its answer, not as in common cases, under oath, but under the common seal. Angel & Ames on Corporations, 595. In the case of the *Fulton Bank* v. *The New York and Sharon Canal Company*, 1 Paige Ch. R. 311, Ch. Walworth said: "Corporations answer under their seal, and without oath. They are, therefore, at liberty to deny everything contained in the bill, whether true or false. Neither can any discovery be compelled, except through the medium of their agents and officers, and by making them parties defendants. But no dissolution of an injunction can be obtained, upon the answer of a corporation, which is not duly verified by the oath of some officer of the corporation, or other person, who is acquainted with the facts contained therein."

To the same point, is the case of *Brumly* v. *The Westchester Manufacturing Company*, 1 Johns. Ch. 366.

It is now the usual practice to make such of the individual members of a corporation parties, as are supposed to know something of the matters inquired after in the bill, and such was done in this case, two of the directors having been made defendants. They answered jointly with the corporation, under oath, and another defendant, Maple, separately, without oath; and on certain exceptions, filed and allowed, to the joint answer as well as to the separate answer of Maple, the respondents asked and obtained leave to amend their answer, which was done by erasures and interlineations of the original answer, and by attaching separate pieces of paper to it, to be read as parts of the answer; and then, by interlining and altering the original affidavit, the jurat was erased and a new one attached, and when so amended, the affidavit was re-sworn. On this appearing, complainants moved for a rule on the respondents, to strike out the interlineations and interpolations, and to restore the answer and affidavit to their original condition, which the court refused, and complainants excepted.

The practice in chancery, in this State, is understood to be substantially the same as in the English chancery, modified and changed, in some particulars, by our statute. In both, exceptions are treated and considered as allegations in writing, stating the particular points or matters with respect to which the complainant considers the answer scandalous or impertinent, or not sufficiently responsive to the matters charged in the bill. In his exceptions, he is to state particularly such parts of the bill as he conceives are not fully answered, and ask that the defendant may, in such respect, put in a full answer to the bill. Justice Story held, in *Brooks* v. *Byam et al.*, 1 Story C. C. 296, that

an exception to an answer for insufficiency, should state the charges in the bill, the interrogatory applicable thereto, to which the answer is responsive, and the terms of the answer *verbatim,* so that the court may see whether it is sufficient or not. 1 Newland Pr. 259. And it is a rule that such exceptions can only be sustained, when some material allegation, charge or interrogatory in the bill, is not fully answered. But it is said, exceptions will not lie to the answer of corporations, nor to an answer to which the oath of the defendant is waived, because such answers are not evidence for the party making them. 2 Daniel Ch. Pr. 879; 1 Barb. Ch. Pr. 177; *Bartlett* v. *Gale,* 4 Paige Ch. 504. So that in this case, the court below should not have regarded any exceptions taken to the answer of the corporation, purporting to have been made on oath, except as to the individual directors jointly sued with the corporation, nor to the unsworn answer of Maple. When exceptions are allowed, and the answer is adjudged insufficient, the defendant must file a further answer, within such time as the court shall direct, and on failure so to do, the bill may be taken for confessed; and if such further answer is also adjudged insufficient, the defendant must then file a supplemental answer, and pay all costs attendant thereon; if that is adjudged insufficient, the defendant may be proceeded against for a contempt. (Scates' Comp. 141.) The further answer required, we understand to mean a formal answer, specially directed to the matters excepted to, and to supply the deficiency of the first answer. We do not understand that the original answer is to be changed by erasures, interlineations, or in any other manner, except for scandalous or impertinent matter, or the jurat altered. They must remain as they were originally, as an unmutilated and unaltered file of the court; it must be preserved in its original style, so that it may be used as evidence, if necessary, in another case, or that perjury may be assigned upon it. We know the practice has obtained, on the circuits, to amend bills and answers, and declarations and pleadings, in this manner, and there is not so much objection to it, when such papers are not sworn to. It will be seen by the 22nd section, above cited, that on allowance of exceptions, it is not contemplated that the original answer shall be amended; the rule is, for " a further answer," which further answer must be wholly disconnected in fact, from the original answer, and must be in proper form, and on separate paper. 2 Daniel Ch. Pr. 912, (note.) The court even, cannot order an answer to be taken from the file, after exceptions to it, notwithstanding the answer be evasive. 1 Barb. Ch. Pr. 181. In mere matters of form, or mistakes of dates, etc., an answer can be taken from the file and amended, but it is not allowed to make any material

alteration in it, (2 Daniel Ch. Pr. 911, note 1, where all the authorities are referred to.) This objection was well taken, and should have been allowed.

It is further objected, that after the original answer was thus amended, by erasures, etc., it was not entitled properly, and the seal of the corporation was not attached.

Whereupon the complainants moved to strike the amended answer from the files, for the following reasons: First, that the paper is not properly entitled for an answer; Second, it does not show to what bill of complaint it was filed for an answer; Third, the answer is not signed by the individual defendants, in their proper hands, respectively; Fourth, the company have not signed the same by its chief officer, nor has the seal of the corporation been affixed; Fifth, the original answer has been erased in part, interlineations made therein, and other alterations, to make an amended answer, without the consent of the court; and for other informalities not specified. The court denied the motion, and the complainants excepted.

All the reasons given in support of this motion were good, except the third, for we suppose it is not absolutely necessary each individual defendant should write his own name to an answer. It is sufficient if his name is there without objection from him.

As to the first and second reasons, the paper purporting to be an answer, does not refer to any bill as pending. This is held to be good ground for taking an answer from the file for irregularity. 2 Danl. 841. So also, where the plaintiff was misnamed in the title, an order was made to take the answer off the file, and for process of contempt to issue. Ib. An answer with these defects is a nullity, and in the notice of the motion to take it from the file, it must not be called an answer, but "a certain paper writing." Ib. This strictness, perhaps, would not be required in our practice, yet we will require that the answer shall clearly indicate to what bill it is an answer. For reasons already given, the fourth and fifth objections should have been sustained, and it was error to disallow them.

On the refusal of the court to take the amended answer from the file, the complainants presented the same exceptions as to the original bill, some of which should have been allowed, which were disallowed, especially those numbered nine, fourteen, sixteen, seventeen, twenty-third, twenty-sixth, and twenty-seventh. The thirty-third exception is to the want of direct answers to the specific interrogatories of the bill.

Of the nine distinct parts which make up a bill in chancery properly framed, several of them are not considered as indispensable. As in amicable suits, the fourth, charging combina-

tion, etc., is always omitted, and so is the charging part often omitted, and is not indispensable in any case, for the stating part of the bill ought fully to unfold the complainant's case, and the charging part in general contains little more than an enlargement of the stating part. It is useful as anticipating the defense, and is in effect a special replication. Nor is the interrogating part absolutely necessary, for if the defendant fully answers to the matters of the bill, with their attendant circumstances, or fully denies them in the proper manner on oath, if the oath be not waived, the whole object of the special interrogatories is completely accomplished. They are, however, quite useful to sift the conscience of the defendant, and are quite universal in practice, except in amicable suits, and in cases where the oath is waived. In this case, imperfect and insufficient answers having been given to many of the charges and statements of the bill, every opportunity should have been afforded by the court, to complainants, to " sift the consciences" of the defendants, and should have compelled them to answer fully to each specific interrogatory, the interrogatories being based upon the charges and statements in the bill. When the answer is full, it is not necessary to answer the interrogatories. In our practice, where the oath of a defendant is waived, answering interrogatories, or failing to answer them, is of but little importance, as there is no conscience in the matter. Here the defendants most interested, the two directors, answered under oath, and they should have been required to answer to each specific interrogatory, inasmuch as their answers to the charges and statements of the bill, were not as full and direct as they might have been. The peculiar boast of equity is its efficiency when the common law fails; and this efficiency is mainly attributable to the virtues of its searching interrogatories, by which the defendant is, or is expected to be, purged. When facts or their leading circumstances, rest only in the knowledge of the party, a court of equity applies itself to his conscience, and purges him upon oath with regard to the truth of the transaction. 3 Bl. Com. 437.

Another objection was taken to the ruling of the court on the motion of complainants to continue the cause on the affidavit of Asoph Perry. The defendants, rather than the cause should be continued, admitted the affidavit, the court deciding that the statements in the affidavit were not to be taken as absolutely true, but were to have the same weight only as if such facts had been sworn to by the witnesses named in the affidavit, and were liable to be contradicted or qualified by other evidence.

We think, on principle, this view of the court was correct, as all parol testimony should be open to contradiction, and to

rebuttal, but this court, having at a very early day, established a different rule by declaring that when an affidavit for a continuance is admitted by the opposite party, the facts stated in it cannot be contradicted, and that adhered to up to this time, we do not feel justified in disturbing it.   *Willis* v. *The People*, 1 Scam. R. 402.

Having disposed of the minor questions in the case, we will now proceed to state the meritorious grounds on which the decree should be reversed.

It appears the Mississippi and Wabash Railroad Company was chartered by an act of the general assembly of this State, approved February 10th, 1853, (Laws of 1853, p. 73,) by that style and name, and was authorized to construct and equip a railroad from Warsaw, in Hancock county, on the most eligible route eastwardly, by the way of the city of Bloomington, to the east line of the State, with the privilege of connecting by contract with any railroad in the State of Indiana, at any point within twenty miles north or south of the latitude of Bloomington.

On the 14th February, 1857, (Laws 1857, page 1053,) the general assembly passed an act amendatory of this charter, reciting " that for the purpose of facilitating and more effectually securing the early construction of certain portions of the Mississippi and Wabash Railroad line, the said railroad line, with all the stock, work, subscriptions, franchise and effects thereunto belonging, are hereby divided and set apart into three divisions," describing them.   The western being that part of the line between Warsaw and the Northern Cross Railroad—the central being that part between the Northern Cross and the Illinois river, and the eastern the remainder, being that part of the original line running between the Illinois river and the east line of the State.

The second section provides that each of the divisions shall be under the control of three commissioners, to be annually elected by the stockholders, private and corporate, and that the respective boards of commissioners thus elected for each or either division, shall have and exercise all the powers of the original or whole board of directors of said company, upon and pertaining to the contracting, constructing and completing their respective divisions of said road, and operating the same, and shall hold their offices until their successors are duly elected and qualified.

The third section provides for the equitable division of the liabilities of the whole company, theretofore incurred, between the different divisions, each division to liquidate its just proportion of the same, and each division to be capable of contract-

24

ing, and be liable and alone responsible for its own debts or obligations contracted; and nothing herein contained is intended, or to be construed, to invalidate or annul any contract, agreement or subscription made by or to said railroad company.

The fourth section provides that the road as located, from Warsaw by way of Hamilton to Carthage, shall not be materially changed, but that there shall be a branch, or an extension of said road from Hamilton to the easterly shore of the main channel of the Mississippi, opposite the old limits of the city of Keokuk, Iowa, with a proviso for additional subscriptions to make the extension. The fifth section provides that the line of the central division, shall be located and constructed by Canton, in the county of Fulton, and may be extended and terminate at Peoria.

The sixth provides that the western and central divisions may each or either contract and connect with the Northern Cross Railroad, and the western division may contract or connect with the Warsaw and Rockford Railroad, to build, equip and operate the road between Hamilton and Warsaw.

This amendatory act, presents the questions on which we decide the case, and they are,—does this act make a fundamental change in the charter—is it so extensive and radical, as to work a dissolution of the original contract? Or, is it merely auxiliary to the original design, and has it been legally accepted?

This is the test to be applied to alterations of all charters. When the vote of Fulton county was taken, to subscribe stock, the charter provided for one continuous road across the State, from the Mississippi river, on the west, to the state line, on the east, two hundred and thirty miles in length, and traversing by far the most beautiful and fertile part of the State. An enterprise, it must be confessed, of great magnitude, and promising facilities for a vast and extended commerce and intercommunication with distant markets, an object well calculated to claim and receive the favorable regard of the people of a county lying on its track. This may safely be taken as one of the inducements to the vote for a subscription to its stock by the people of Fulton county. A great thoroughfare across the State, presided over by an intelligent and competent directory, whose management and counsel would be equally beneficial to all portions of it, and large dividends resulting, were objects, compared with which, a county debt of seventy-five thousand dollars, would be quite insignificant. It was for such a road, so to be governed and controlled, the people voted, whose dividends, when completed, as the proofs show, would equal those of the best lines in the State. The presumption always is, that such investments are made with a view to the profits to be derived from the stock

subscribed, as an investment. The expected dividends are to be considered as the moving cause of subscription to the stock.

It is also in proof, that the dividends on the central portion of this road, if completed and not connected with the eastern and western divisions, would probably be worthless, and at most of but little value. There is no proof in the record, that any arrangements have been made to connect the different divisions, and no assurances that they will be connected; and if there should be, there are no assurances of such running arrangements on the several divisions as to make the several divisions a continuous, through line of travel; and even if there were, Fulton county would be a stockholder, not in a line of .road the eastern and western divisions of which would be making good dividends, but in the central portion of it only, in which no dividends may be declared. As to Fulton county then, the great enterprise, originally contemplated, has dwindled down to a mere local road fifty miles in length, having no important termini, the stock in which, as appears by the record, would be of a nominal value only. We cannot but think, in this view, that the alteration of the original charter, by dividing this great road, was fundamental, and the stockholders released from their subscriptions.

The facts in the record show that a great and most important and very promising line of travel has been broken up into fragments—each fragment deprived of the united counsels of a board of directors for the whole line, and their several interests confided to local commissioners, and the several divisions in no way bound or pledged to prosecute the original enterprise. By the amendment, the plaintiffs have an interest in fifty miles only of the road, and none in the remaining one hundred and eighty miles from which the profits may be derived. These fragmentary parts have no necessary connection with each other, and is such a disposition of the original corporate powers of the company as to amount to its dissolution. At any rate, it is not the corporation in which the plaintiffs intended to become stockholders.

But it is argued, that the company has accepted the alteration, and such acceptance is binding on the subscribers. If this is so, the stockholders would not be liable.

In the cases referred to, (*Barret* v. *The Alton and Sangamon Railroad Company,* 13 Ill. R. 504; of *Sprague* v. *The Illinois River Railroad Company,* 19 ib. 174, and *The Illinois River Railroad Company* v. *Zimmer,* 20 Ill. R. 654,) it is nowhere intimated that fundamental changes, by the legislature, shall not release subscribers to stock, though those changes in the charter be accepted by the directors. It is only such alterations as may be fairly regarded as auxiliary to the original design.

But has this amendatory act of 1857 been accepted by the original company ? The record does not show that it has. The eastern division had not accepted it previous to the commencement of this suit, and the western and central divisions by user only—by electing commissioners as provided by the act. The old corporation had not had a meeting for several months before the passage of the act of 1857, nor since, so far as the record shows ; and it would seem, that all parties interested considered the original project abandoned, subscribers to stock having been permitted to erase their names from the stock books, and to appropriate their subscriptions to the Jacksonville and Savanna Railroad. No acceptance by the old company of this act is shown, and it is indispensable that this should be shown. This transmutation, by this amendatory act, must be sanctioned in some mode known to the law, by the original company. Neither one of the new corporations, nor could all of them, acting separately, ratify and accept the change.

The demand for these bonds is made of the plaintiffs by J. M. Ingersoll, assuming to be the president and one of the commissioners of the central division of the Mississippi and Wabash River Railroad Company. We cannot but consider, for the reasons given, this company thus acting, as another and different company from the one to which the subscription was made, and there is nothing appearing on the record to show that it has succeeded to the rights of the original company in any form authorized by law. There is no evidence of the acceptance of the provision in the amendatory law, authorizing such succession of rights. For anything that appears, the old company in its original form is still in being, and may demand these bonds. We are clearly of opinion, the central division of the road is not entitled to the bonds, and accordingly reverse the decree entered in the cause.

Another objection has been made by complainants which we deem necessary to notice now. It is as to the manner in which this question of subscription to the stock of this road was submitted to the vote of the people.

By the act of November 6, 1849, authorizing counties and cities to subscribe stock to railroad companies, (Scates' Comp. 950,) it is provided in the 1st section, that whenever the citizens of any city or county in this State, are desirous that said city or county should subscribe for stock in any railroad company, already organized or incorporated, or hereafter to be organized or incorporated, under any law of this State, such city or county may, and is hereby authorized, to purchase or subscribe for shares of the capital stock in any such company, in any sum not

exceeding one hundred thousand dollars, for each of such cities or counties.

The 4th section provides that no subscription shall be made, or bonds issued, unless a majority of the qualified voters of such city or county, shall vote the same. Thirty days' notice of the time of voting is to be given, "requiring said electors of said counties or cities, to vote upon the day named in such notices, at their usual place of voting, for or against the subscription for said capital stock, which they may propose to make, and said notices shall specify the company in which stock is proposed to be subscribed, the amount which it is proposed to take, the time which the bonds proposed to be issued are to run, and the interest which said bonds are to bear," etc.

The order made by the board of supervisors of Fulton county, under this law, does not seem to be in strict conformity to it. The law evidently contemplates a vote for or against subscription, to some one company only, specifying the company. The order is for a subscription to the Mississippi and Wabash River Railroad Company, and the Petersburg and Springfield Railroad Company, seventy-five thousand dollars to each.

This is not only not pursuant to the law, but is manifestly unfair. All elections, as well for measures as men, should be perfectly free, uninfluenced by any consideration, other than the merits of the individual man or measure proposed. We boast of the freedom of the elective franchise, should we not strive to swell the boast by its purity also? A single, isolated measure, such as a railroad, may not unite a majority of a county to whom it is proposed. It may favor, if constructed, one portion of a county more than another, and thereby be prevented from receiving a clear majority vote, such as the law clearly contemplates shall be given. Is it fair, in order to accomplish this object, to attach another measure to it, to be voted on at the same time, which may benefit the opposing portion of the county? The law never intended that two roads should be coupled together, and the people forbidden to vote for one if they did not also vote for the other, the one road being really a bribe offered for votes for the other. The truth is, the voters of Fulton have never had an opportunity to vote, and never have voted this subscription, for the question was at no time distinctly before them. The question before them was, will you vote for a subscription to two roads? Neither road has received the approving vote of the people, and until that is done, until the naked single question shall be fairly presented to those voters, they ought not to be bound, or injuriously affected, by any such jockeying management and log-rolling. By this system, condemned as it has always been, by the moral sense as well as

Supervisors of Fulton County *v.* Mississippi and Wabash Railroad Co.

sense of justice, of the whole country, it should at this day find no favor in the courts. We do not hesitate to say, this proposition to vote on two roads at the same time, was not authorized by the law, and is a fraud on the people.

This tacking one measure upon another, is unjust in another view, as it gives the County Court power to weigh down a popular single measure, by attaching odious measures to it, and thus virtually depriving the people of their right to vote on the one measure, the success of which would greatly promote their interests.

Such maneuvering should be condemned everywhere, as unfair and unjust, and we so regard it. The order made by the board of supervisors, in thus obtaining the vote of the people, is considered as unauthorized by the act.

The decree of the Circuit Court is reversed.

*Decree reversed.*